No. 25-1776

IN THE
UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

KEISHA L. LEWIS,
*Plaintiff-Appellant*,

v.

INDIANA DEPARTMENT OF
TRANSPORTATION,
*Defendant-Appellee.*

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division,
No. 1:23-cv-1865-JMS-MJD,
The Honorable Jane Magnus-Stinson, Judge.

**BRIEF OF APPELLEE**

THEODORE E. ROKITA
Indiana Attorney General

EVAN MATTHEW COMER
Supervising Deputy Attorney General

JOHN R. OOSTERHOFF
Deputy Attorney General

OFFICE OF INDIANA ATTORNEY
GENERAL TODD ROKITA
Indiana Government Center South
302 West Washington Street, Fifth Floor
Indianapolis, Indiana 46204-2770
317-233-2728
Evan.Comer@atg.in.gov
John.Oosterhoff@atg.in.gov

*Counsel for Appellee*

**TABLE OF CONTENTS**

Table of Authorities ............................................................................................... iii

Jurisdictional Statement ......................................................................................... 1

Statement of the Issues .......................................................................................... 2

Statement of the Case ............................................................................................ 2

    A.  Lewis's disability and work at the Indiana Department of
       Transportation ................................................................................................. 2

    B.  Lewis's work-from-home accommodation ............................................... 4

    C.  Issues leading to Lewis's termination ....................................................... 8

    D.  Director Geibel discovers Lewis's backlog of unprocessed parcels ................. 12

    E.  Lewis's legal action against the Department, Director Geibel, and
       Manager Foreman ......................................................................................... 13

Summary of the Argument ................................................................................... 15

Argument:

    I.    The Department is entitled to summary judgment regarding Lewis's
        Rehabilitation Act claims. ........................................................................... 17

        A.  Lewis's Rehabilitation Act claim fails at summary judgment
            because she cannot meet her burden of showing that the
            Department's legitimate reasons for her termination were
            pretextual ................................................................................................ 18

            1.  "Solely by reason of" is the proper causation test for § 504
                discrimination claims ................................................................... 20

            2.  Lewis cannot show that her disability caused her termination
                because there is no evidence to support an inference that the
                legitimate, non-discriminatory reasons provided for her firing
                were pretextual ............................................................................ 24

        B.  Lewis cannot prevail on her § 504 retaliation claim under any set
            of circumstances ................................................................................... 33

i

II.   The Department is entitled to summary judgment on Lewis's Title VII claims...................................................................................37

　　A.  Lewis waived her Title VII claims .......................................................37

　　B.  Lewis has not shown racial discrimination ...........................................39

　　C.  Lewis has not shown Title VII retaliation.............................................41

Conclusion...................................................................................................43

Fed. R. App. P. 32(g) Word Count Certificate ........................................................44

Certificate of Service...................................................................................44

## TABLE OF AUTHORITIES

**CASES**

*Adebiyi v. S. Suburban Coll.*, 98 F.4th 886 (7th Cir. 2024) ..................................... 35

*Anderson v. Hardman*, 241 F.3d 544 (7th Cir. 2001) ............................................. 38

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ............................................ 17

*Argyropoulos v. City of Alton*, 539 F.3d 724 (7th Cir. 2008) ................................... 25

*Bostock v. Clayton Cnty., Ga.*, 590 U.S. 644 (2020) ........................................... 24, 40

*K.M. ex rel. Bright v. Tustin Unified Sch. Dist.*, 725 F.3d 1088
    (9th Cir. 2013) ............................................................................................. 23

*Brooks v. Avancez*, 39 F.4th 424 (7th Cir. 2022) ................................... 17, 19, 34, 35

*Brumfield v. City of Chicago*, 735 F.3d 619 (7th Cir. 2013) ............................... 22, 28

*Bruno v. Wells-Armstrong*, 93 F.4th 1049 (7th Cir. 2024) ................................. 27, 32

*Conners v. Wilkie*, 984 F.3d 1255 (7th Cir. 2021) ....................................... 21, 23, 24

*Crain v. McDonough*, 63 F.4th 585 (7th Cir. 2023) ............................................... 33

*Culver v. Gorman & Co.*, 416 F.3d 540 (7th Cir. 2005) ........................................... 25

*David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216
    (7th Cir. 2017) ............................................................................................. 40

*Felix v. Wis. Dep't of Transp.*, 828 F.3d 560 (7th Cir. 2016) ......................... 19, 22, 28

*Flynn v. FCA US LLC*, 39 F.4th 946 (7th Cir. 2022) ............................................... 29

*Fuller v. McDonough*, 84 F.4th 686 (7th Cir. 2023) .......................................... 34, 35

*G.C. v. Owensboro Pub. Sch.*, 711 F.3d 623 (6th Cir. 2013) .................................... 23

*Gaddis v. DeMattei*, 30 F.4th 625 (7th Cir. 2022) ................................................. 17

*Greenbank v. Great Am. Assurance Co.*, 47 F.4th 618 (7th Cir. 2022) ..................... 37

*Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852 (7th Cir. 2005) ............. 27, 32, 33

*Harper v. C.R. England, Inc.*, 687 F.3d 297 (7th Cir. 2012) .................................... 25

*Hooper v. Proctor Health Care Inc.*, 804 F.3d 846 (7th Cir. 2015) ........................... 19

**CASES (cont'd)**

*Houston v. Texas Dep't of Agric.*, 17 F.4th 576 (5th Cir. 2021) ................................. 23

*Hudson v. Chicago Transit Auth.*, 375 F.3d 552 (7th Cir. 2004) .............................. 28

*Huff v. Buttigieg*, 42 F.4th 638 (7th Cir. 2022)......................................................... 34

*Johnson v. Advoc. Health and Hosps. Corp.*, 892 F.3d 887
(7th Cir. 2018)................................................................................................ 37, 40

*Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892 (7th Cir. 2003) ........................... 31

*Lalvani v. Cook County*, 269 F.3d 785 (7th Cir. 2001) .............................................. 43

*Lesiv v. Ill. C. R.R. Co.*, 39 F.4th 903 (7th Cir. 2022)................................................ 42

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) ........................................ 18

*Monroe v. Indiana Dep't of Transp.*, 871 F.3d 495 (7th Cir. 2017) .......... 21, 25, 27, 29

*Moser v. Indiana Dep't of Corr.*, 406 F.3d 895 (7th Cir. 2005) ................................ 31

*Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016)..................... 17, 18, 40

*Palmer v. Circuit Ct. of Cook Cnty.*, 117 F.3d 351 (7th Cir. 1997)........................... 28

*Parker v. Brooks Life Sci, Inc.*, 39 F.4th 931 (7th Cir. 2022) ................................... 28

*Reives v. Ill. St. Police*, 29 F.4th 887 (7th Cir. 2022)................................................ 40

*Robertson v. Dep't of Health Servs.*, 949 F.3d 371 (7th Cir. 2020)........................... 41

*Rowlands v. United Parcel Serv.*, 901 F.3d 792 (7th Cir. 2018) ............................... 34

*Royan v. Chicago State University*, 145 F.4th 681 (7th Cir. 2025) ...................... 23, 24

*Sansone v. Brennan*, 917 F.3d 975 (7th Cir. 2019)................................................... 28

*Scaife v. United States Dep't of Veterans Affairs*, 49 F.4th 1109
(7th Cir. 2022)....................................................................................................... 34

*Singmuongthong v. Bowen*, 77 F.4th 503 (7th Cir. 2023) ......................................... 41

*Swain v. Wormuth*, 41 F.4th 892 (7th Cir. 2022) ................................................*passim*

*Thomas v. Christ Hosp. & Med. Ctr.*, 328 F.3d 890 (7th Cir. 2003) ......................... 32

CASES (cont'd)

*United States v. Berkowitz*, 927 F.2d 1376 (7th Cir. 1991) .......................................... 39

*United States v. Johnson*, 47 F.4th 535 (7th Cir. 2022) .............................................. 21

*United States v. Pace*, 48 F.4th 741 (7th Cir. 2022) ................................................... 20

*Wicomico Nursing Home v. Padilla*, 910 F.3d 739 (4th Cir. 2018) ............................ 23

*Willis v. Lepine*, 687 F.3d 826 (7th Cir. 2012) .......................................................... 28

STATUTES

28 U.S.C. § 1291 ............................................................................................................... 1

28 U.S.C. § 1331 ............................................................................................................... 1

28 U.S.C. § 1343 ............................................................................................................... 1

29 U.S.C. § 504 .......................................................................................................*passim*

29 U.S.C. § 504(a) ............................................................................... 19, 20, 21, 24

29 U.S.C. § 504(d) ......................................................................................................... 20

29 U.S.C. § 764(a) ................................................................................................... 19, 22

29 U.S.C. § 794 .......................................................................................................*passim*

29 U.S.C. § 794(a) ................................................................................................... 20, 21

29 U.S.C. § 794(d) ......................................................................................................... 20

42 U.S.C. § 1981 ...................................................................................................... 1, 2, 14

42 U.S.C. § 2000e–2(a)(1) .......................................................................................*passim*

42 U.S.C. § 12112 .................................................................................................... 20, 21

**OTHER AUTHORITIES**

Fed. Rule of Appellate Procedure 4(a)(1)(A) ...................................................... 1

Fed. Rule of Appellate Procedure 28(a)(8)(A) ........................................................ 37

Fed. Rule of Civil Procedure 56(c) ........................................................ 17, 29

Fed. Rule of Civil Procedure 58 ........................................................................ 1

*Soley*, MERRIAM-WEBSTER ONLINE DICTIONARY, available at
https://www.merriam-webster.com/dictionary/solely
(last visited Nov. 14, 2025) ............................................................... 21

**JURISDICTIONAL STATEMENT**

Appellant's jurisdictional statement is not complete and correct. Plaintiff, Keisha Lewis, filed a complaint on October 17, 2023, alleging that the Indiana Department of Transportation (the Department) discriminated and retaliated against her in violation of § 504 of the Rehabilitation Act and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*, by terminating her employment after received an accommodation to work from home based on a medical disability and submitted an internal complaint of discrimination (R.1 at 3–4). Lewis also alleged that her manager, Julie Foreman, and William Geibel, who served as Director of the Department's Real Estate Division, terminated Lewis's employment because of her race in violation of 42 U.S.C. § 1981 (R.1 at 6–7). The district court had subject matter jurisdiction over Lewis's complaint under 28 U.S.C. §§ 1331 and 1343 because the complaint alleged violations of Lewis's federal civil rights.

On December 19, 2024, the district court dismissed Manager Foreman as a defendant with prejudice pursuant to an agreement of the parties (R.65). On April 10, 2025, the district court entered an order granting summary judgment for the Department and Geibel and entered final judgment (R.72; R.73). *See* Fed. R. Civ. P. 58. Lewis timely filed a notice of appeal on May 1, 2025 (R.75). *See* Fed. R. App. P. 4(a)(1)(A). This Court has jurisdiction over the appeal pursuant to 28 U.S.C. § 1291 because it is an appeal from a final judgment on the merits as to all claims and all parties. Pursuant to a stipulation of the parties, this Court dismissed Director

1

Geibel as a defendant on November 14, 2025, resolving Lewis's § 1981 claims and leaving the Department the only defendant in this appeal (Dkt. 16).

## STATEMENT OF THE ISSUES

I.      Whether the Department is entitled to summary judgment as to Lewis's claim of disability discrimination and retaliation under § 504 of the Rehabilitation Act.

II.     Whether the Department is entitled to summary judgment as to Lewis's claims of racial discrimination and retaliation under Title VII of the Civil Rights Act of 1965.

## STATEMENT OF THE CASE

### A. Lewis's disability and work at the Indiana Department of Transportation.

Keisha Lewis began working for the Department in 2014 as a Program Director 2 in the Department's real estate division (R.50-1 at 17–18, 29–30). Lewis was responsible for "administer[ing] state and federal relocation programs statewide for the Indiana Department of Transportation and local governments" (R.50-18 at 1), which included reviewing, approving, and processing, "all relocation claim vouchers for assistance payments" (R.50-18 at 1; R.50-1 at 34–38). When the Department needed to request that people move due to a roadway project, Lewis acted as a point of contact with agents who conducted the direct contact, research, and paperwork for the displacees, or "parcel owners," regarding relocations (R.50-2 at 18–19; R.50-1 at 34–38, 197). It was also her responsibility to prepare and mail checks to parcel owners to help them relocate (R.50-1 at 36–37, 88–81, 91, 97–98).

2

In January 2020, the Department hired Geibel to serve as Director of the real estate division, where Lewis worked (R.50-2 at 6). Foreman, who served as Manager of Acquisitions and Relocation, reported directly to Geibel (R.50-2 at 10). Director Geibel met Lewis shortly after he started as the division director, and he saw her regularly when they both were in the office (R.50-2 at 11, 13).

Around March 2020, the Department staff, including Lewis, began working remotely due to COVID-19 (R.50-1 at 51, 55). The responsibility of mailing checks to parcel owners transitioned to the finance department, who conducted bulk hand offs of checks in fewer instances due to the pandemic (50-1 at 79–82; R.50-2 at 57–58).

Lewis was promoted to Program Director 1 in the Real Estate Division's relocation department in 2021, a position that had many of the same job duties as Program Director 2 (R.50-1 at 17–18, 30–33, 37–38, 44–45). Director Geibel worked for "months and months" to help justify Lewis's 2021 promotion to Program Director 1 (R.50-2 at 34–36). After being promoted, and receiving a raise, Lewis complained to Director Geibel that "the percentage of the increase in raise was not sufficient" because he "only gave [her] a 9 percent increase" along with her promotion "versus somebody getting a 12 percent increase who also was promoted right around the same time period" because she was African American (R.50-2 at 34-35).[1] Director Geibel explained that the other individual received a higher raise than Lewis did

---

[1] The district court identifies this other individual as Dallas Sharp, a White employee who was also a supervisor who reported to Manager Foreman (R.72 at 45 n.5; R.72-3 at 150; R.50-1 at 141-42). Director Geibel did not identify this individual in his testimony and Lewis has not identified any specific person that was the subject of this complaint (R.62 at 15-16, 31-32; R.50-1 at 209).

3

because that individual's salary was well below Lewis's salary range and that the State Personnel Department set salaries, not himself (R.50-2 at 35–36).

In February of 2022, Lewis's performance appraisal stated that she exceeded expectations (R.60-1 at 1, 14). In the following months, employees of the Department gradually began returning to the office (R.50-1 at 53; R.50-22 at 2). Starting August 8, 2022, Lewis began working from home only two days a week (R.50-1 at 53; R.50-22 at 2). On August 16, 2022, Finance Operations Manager Bennett informed Lewis that she would once again be responsible for mailing checks to parcel owners (R.50-1 at 80–82). Lewis was concerned, however, about COVID-19 precautions like social distancing when returning to the office because she was born with one kidney and suffered from kidney failure (R.50-1 at 23–24, 67–69). She received a kidney transplant in 2008 and has a compromised immune system that requires her to visit the doctor twice a year (R.50-1 at 21–22). Based on this condition, Lewis applied to work remotely full-time (R.50-1 at 63–65; R.60-6).

**B. Lewis's work-from-home accommodation.**

Lewis was informed that her request for an accommodation to work remotely full-time was approved on September 1, 2022, by Human Resources Director Gurney with the State Personnel Department (R.50-1 at 63–65; R.60-6). That same day, Lewis emailed Finance Operations Manager Bennett and said that she would no longer be mailing out checks because she was approved to work remotely (R.50-1 at 83, 100; R.50-6). Shortly thereafter, Finance Operations Manager Bennett saw a social media post depicting Lewis "at a football game, a crowded place" (R.50-3 at

4

53–54). She reported the social-media post to human resources and informed Lewis's manager, Julie Foreman, that she would no longer direct the finance team to mail checks for Lewis (R.50-3 at 54). On September 16, Manager Foreman directed Lewis to continue to prepare and mail checks, and stated that she or Geibel would meet her "curbside" to collect the checks so that Lewis did not have to enter the building (R.50-7 at 3).

Around the same time, the State Personnel Department recommended that Manager Foreman have daily virtual meetings with Lewis to monitor her work progress while she was working remotely (R.50-2 at 47; R.50-1 at 114–15). Those daily meetings began on September 19, and were held at precisely 8:00 a.m. (R.50-2 at 47; R.50-1 at 114–15; R.50-3 at 137–38). That day Lewis emailed Finance Operations Manager Bennett to inform her that she would no longer enter financial coding ("Peoplesoft ID and Location Numbers") on relocation vouchers, which she stated was a task she had voluntarily completed for the finance department for the past two years (R.50-8; R.50-1 at 93–94). Manager Foreman prepared to discuss the email with Lewis and received talking points from Human Resources Director Gurney (R.60-3 at 2).

Gurney suggested that Manager Foreman inform Lewis that she was "out of line," that failure to complete job duties that are asked of her "is insubordination," and that Foreman should request additional documentation to support her work from home accommodation (R.60-3 at 2). Manager Foreman responded to Human Resources Director Gurney later that day stating that she had a conversation with

5

Lewis and that she told Lewis that "it was considered insubordination for her to 'tell' another manager what she will and will not do" (R.60-3 at 1). Manager Foreman also stated that she had informed Lewis that human resources would like to see additional information from her physician regarding her accommodation (R.60-3 at 1). Later that day, Lewis emailed Human Resources Director Gurney regarding the request for additional information for her accommodation (R.60-5 at 1). In the email, Lewis stated "this is borderline harassment and/or discrimination due to my medical condition" (R.60-5 at 1).

The next day, September 20, Finance Operations Manager Bennett emailed Lewis requesting that she continue entering financial coding on the vouchers, stating that the finance department asked her to do this not as a favor but because they "were having issues with [Lewis's] vouchers using the wrong addresses" and that her entry of the coding solved that issue (R.50-8 at 1). Lewis responded that Manager Foreman had relieved her of that responsibility (R.50-9).

Manager Foreman then responded to the email chain, stating that after confirming Lewis's responsibilities with Finance Operations Manager Bennett, Lewis would be required "to perform those tasks" (R.50-9). Foreman also told Lewis that she would be held to the same standards as an employee in the office and that "failure to carry out a job duty is insubordination and will result in disciplinary action" (R.50-9; R.60-3 at 2). In response, Lewis emailed the State Personnel Department stating that she had begun receiving "harassing phone calls from [her] direct supervisor" regarding her accommodation and that she "had no other choice

6

than file a complaint against … Julie Foreman, for harassment and discrimination of [her] medical condition" (R.50-16 at 1).

The following week, Human Resources Director Gurney informed Lewis that she did not need to provide any further information for her to keep her accommodation and that she would no longer be responsible for coming downtown to handle the checks (R.60-6 at 1). Lewis acknowledged that this resolved her initial complaint regarding "assistance with [her] job where checks were concerned and regards to showing further documentation for [her] ADA accommodation" (R.50-12 at 1).

On September 29, Lewis submitted another internal complaint alleging that she felt discriminated against due to her disability (R.50-1 at 149–50; R.50-12 at 1). This time she also included Human Resources Director Gurney in her compliant because she did not think she should have been asked to provide more information about her accommodation (R.50-1 at 149–50; R.50-12 at 1). There were no references to racial discrimination in either of the complaints Lewis filed or their related communications (R.50-1 at 150; R. 50-12). Nor did Director Geibel's name appear in the email of either complaint (R.50-1 at 148–149; R.60-5 at 1; R.50-12).

Around this time, Lewis had meetings with Manager Foreman at specified times about once a week in the office to "drop-off files … to close out in the system" (R.50-1 at 103, 110). Between September 30, and October 13, Lewis was late for two out of three meetings, which were the only meetings scheduled during that time (R.50-1 at 111; R.50-3 at 135). In one instance, she was 20 minutes late to a meeting

7

due to a ceremony at her daughter's school, even after she took two hours of personal time either the night before or the morning of (R.50-1 at 103–04).

## C. Issues leading to Lewis's termination.

On October 17, 2022, Manager Foreman emailed Director Geibel and Human Resources Director Gurney to report "another instance of insubordination" (R.50-11). Manager Foreman stated that Lewis "was late (again) in dropping off parcels" (R.50-11). Manager Forman also found some of Lewis's behavior inconsistent with her medical accommodation, such as taking her children on public outings and hugging and standing close to another staff member while making small talk after arriving late to drop off parcels (R.50-11). Additionally, Foreman stated that a worklog Lewis submitted on October 13, 2022, for four days of work "might represent four hours, but certainly not four days" and Lewis refused to provide further detail about her work when asked (R.50-11).

One day later, Manager Foreman and Lewis had their regular 8:00 a.m. check-in meeting (R.50-1 at 116). Foreman asked Director Geibel to join the meeting, but Lewis was unaware he would be attending (R.50-14 at 1; R.50-1 at 117). Foreman and Lewis discussed an upcoming "diversity inclusion week," which Lewis stated she wanted to withdraw from "because of what [she was] … going through" with Foreman and Geibel reporting her to human resources (R.50-1 at 116–17). Both Foreman and Geibel denied reporting her to human resources and stated that they wanted to make sure everything was okay given the inconsistencies in her work logs (R.50-1 at 118).

8

After the call, Manager Foreman emailed Lewis and Director Geibel and instructed Lewis that she was required to provide a weekly summary of her work, stating, "The format of the summary is of your choosing (excel or word); however, it is not to be a list of projects in the body of an email" (R.50-14 at 3). In a subsequent chain of emails, Lewis expressed discomfort with Director Geibel's attendance at the meeting, and Manager Foreman told Lewis that "talking over [Director Geibel] is disrespectful and inappropriate" (R.50-14 at 1). Later that day, Lewis's teleconference account indicated she was "away" for 53 minutes (R.50-14 at 13). Manager Foreman asked why she was "away," and Lewis stated that she was "dealing with a matter with [human resources] and [she] took [her] lunch" (R.50-14 at 12).

In another instance, Lewis failed to join the daily virtual meeting, which was scheduled during her reported work time (R.50-3 at 137–138). After waiting a few minutes, Manager Foreman called Lewis's cell phone and Lewis stated that she was at a gas station (R.50-3 at 137–138). Manager Foreman instructed her to call back when she returned home (R.50-3 at 137–138). Lewis later stated in an email, "Although I was 10 minutes late … I apologize for running late due to … almost running out of gas" (R.50-3 at 137; R.50-13).

On October 27, Manager Foreman reminded Lewis to submit the summary of her work, and Lewis responded that she was "not sure what you want me to send" (R.60-8 at 4–5). Lewis, Manager Foreman, and Director Giebel proceeded to discuss the details of what Lewis was required to report in an email chain (R.60-8 at 1–5).

9

Lewis contended that she was being asked to provide a relocation data sheet that another employee, Data Integrity Specialist Devin Hutcheson, had previously generated (R.60-8 at 3–5). Director Geibel and Manager Foreman responded that Lewis was mistaken and that such a report was not what they wanted and Lewis would not require additional training to provide "a summary [with Lewis's] insight on all the finite details of relocation projects" (R.60-8 at 2–3).

After receiving pushback from Lewis, Manager Foreman replied, "Is it not possible for you to survey our consultants and enter that data onto a spreadsheet?" (R. 60-8 at 2). Foreman explained, "no special training needs to be done" and "[n]o coordination with [the data integrity specialist] is required or desired" (R. 60-8 at 2). Manager Foreman explained that the report from Lewis would answer: "how do you know what to work on?" (R. 60-8 at 2).

In the email exchange with Lewis and Manager Foreman, Director Geibel provided a sample of what was expected:



(R. 60-9 at 3).

Lewis, however, insisted that the data integrity specialist generated the reports in the past and that she required training from him before she could complete the task (R. 60-9 at 3). Director Geibel wrote back, "Unfortunately, that is

10

not the point. You have information in emails and status information for all active relo[cation] projects that may or may not be updated in LBS" (R. 60-9 at 2). Despite being told not to do so, Lewis informed Geibel and Foreman that she had contacted the data integrity specialist for his assistance (R. 60-9 at 1–2). Lewis eventually told Director Geibel that he should "find and run a report and create it" himself (R.50-2 at 26).

That same day, Manager Foreman began documenting what she believed to be Lewis's "inappropriate/egregious behavior" for Human Resources Director Gurney per his recommendation (R.50-3 at 65–66). Human Resources Director Gurney instructed Manager Foreman that she should not write up Lewis for these instances because it might appear as retaliation due to the open grievance against her (R.50-3 at 66). Manager Foreman documented the following infractions:

- Lewis providing a report of her work late and incorrectly,

- Lewis taking longer than expected to respond to a consultant, and

- The email chain from earlier in the day, where Lewis claimed she could not provide a summary of her current workload

(R.50-3 at 66–67, 72, 126; R.60-8 at 1). Director Geibel also recalled several instances he considered to be insubordinate or inappropriate conduct from the beginning of his working relationship with Lewis, including Lewis making comments "in meetings with consultants and other managers about [his] inability to run a department" (R.50-2 at 30–33).

Lewis emailed Betsy Huffman and Floyd Worley, who worked in the State Personnel Department, to complain about the extra work the report would cause (R.

11

60-9 at 1). In her email, Lewis expressed disagreement with her managers' decision to assign the report to her, stating, "Here we go again. I am trying my best to communicate and understand why management doesn't want to utilize the positions that we have in the office to assist them with their inquir[ies]" (R. 60-9 at 1). Lewis complained that she did not know how to generate the data Director Geibel and Manager Foreman sought, that Geibel and Foreman told her not to seek assistance from the data integrity specialist, and Geibel and Foreman wanted her "to contact agents and get this information and formulate it on an excel spreadsheet along with my other responsibilities" (R. 60-9 at 1). Lewis took issue with the expectation that she "do this along with run[ning] my own program ... without any help" (R. 60-9 at 1). Lewis complained of being short-staffed and admitted that Geibel and Foreman "know I am 2 years behind closing out parcels because I have been doing my department alone for the last 3 ye[ars]" (R. 60-9 at 1).

**D. Director Geibel discovers Lewis's backlog of unprocessed parcels.**

Although Lewis admitted to both the State Personnel Department and Director Geibel to being two-years behind schedule on processing parcels (R. 60-9 at 1), the full extent of her backlog did not become apparent until Director Geibel and Data Specialist Hutcheson generated a report of Lewis's incomplete work (R.50-2 at 25–28; R.50-3 at 79). The report revealed that Lewis had left "over 400 parcels that were not closed out," including some of the largest projects assigned to the Department (R.50-2 at 56–57; R.50-3 at 143). The backlog put the Department at

risk of losing federal funding and Director Geibel stated that the Department incurred $150,000 in costs to correct the backlog (R.50-2 at 57–59).[2]

Both Director Geibel and Manager Foreman decided to terminate Lewis (R.50-2 at 29–30; R.50-3 at 75). However, per Human Resources Director Gurney's instructions, they did not take disciplinary action against Lewis until after the close of the investigation into Lewis's September 29 complaint (R.50-3 at 65–66, 75–76). That complaint was dismissed sometime around December 12, 2022 (R.12 at 9; R.50-1 at 149–50; R.50-12 at 1).[3] Lewis was terminated on December 20, 2022 (R.50-1 at 176; R.50-23 at 1). The Department issued a memorandum of dismissal to Lewis, citing "poor performance and insubordinate conduct" as the reasons for her termination (R.50-1 at 176; R.50-23 at 1).

**E. Lewis's legal action against the Department, Director Geibel, and Manager Foreman.**

Lewis filed a formal charge with the Equal Employment Opportunity Commission alleging disability discrimination, race discrimination, and retaliation by the Department, Director Geibel, and Manager Foreman (R.1 at 5). On October 17, 2023, Lewis filed suit in the district court, alleging disability discrimination and retaliation under the Rehabilitation Act, § 1981, and Title VII against the Department, Manager Foreman, and Director Geibel (R.1). The parties later filed a

---

[2] Lewis did not contest that she was behind resulting fees in the proceedings at summary judgment (R.62 at 7–16).

[3] Lewis alleged her internal complaint was dismissed on December 12, 2023, in her complaint filed in the district court, but the actual date is not clear from the record (R.12 at 9). It is also unclear who dismissed her complaint and for what reason.

joint motion to dismiss the counts against Manager Foreman, which the district court granted (R.63; R.65).

The Department and Director Geibel filed a motion for summary judgment as to the remaining claims: Title VII and Rehabilitation Act claims against the Department and a § 1981 claim against Director Geibel (R.49). They argued that Lewis failed to make a prima facie case of discrimination under Title VII, and that she was unable to show a causal connection between a protected activity and her termination to establish a claim for retaliation (R.49 at 1–2; R.53).

After briefing, the district court entered summary judgment for the defendants (R.72 at 47). First, the court entered judgment on the Rehab Act claim because the undisputed facts showed that Lewis's disability did not cause her termination and Lewis failed to show pretext because she did not dispute her poor work performance at the time of termination, even though the court found that Lewis "at least raised an issue of fact as to whether she is actually disabled" (R. 72 at 33–40). The district court concluded that  Lewis failed to raise an issue of material fact as to whether the Department's reason for terminating her was pretext because she failed to dispute facts relating to her poor work performance at the time of her termination (R.72 at 34, 40–41).

Next, the court granted summary judgment for the Department on Lewis's retaliation claim under the Rehabilitation Act because no reasonable juror could find a causal connection between Lewis's remote work accommodation and the work performance complaints that led to her termination (R.72 at 43). As for Lewis's

14

claims under Title VII, the court found that Lewis had waived her discrimination claim because she "made no effort to demonstrate more-favorable treatment to a comparator, or any comparator at all" in her response in opposition to summary judgment (R.72 at 45).

Finally, the court granted summary judgment for the Department on Lewis's Title VII retaliation claim because Lewis did not raise a material dispute about her supervisor's sincere beliefs regarding her insubordination and ineffectiveness (R.72 at 46–47).

### SUMMARY OF THE ARGUMENT

This Court should affirm the judgment of the district court because the undisputed material facts show that Lewis was terminated from her employment due to her poor performance and insubordination, from being late to meetings to creating a backlog of hundreds of parcels. Lewis's disability did not cause her termination, and the Department did not retaliate against her for seeking an accommodation due to her disability. Accordingly, the district court was correct to grant summary judgment for the Department on Lewis's § 504 and Title VII claims.

Lewis failed to show discrimination under § 504 because the evidence shows that her disability was not a factor in her termination. The district court correctly decided the Department's summary judgment motion using the standard for causation required by the plain text of the Rehabilitation Act—the statute's "solely by reason of" causation standard. The undisputed material facts make it abundantly clear that she was terminated due to her ineffective job performance

and repeated insubordination. These justifications were not pretextual. The record contains significant, undisputed evidence that Lewis performed inadequately at her job, that she was belligerent with her superiors, that she refused to carry out tasks assigned to her, and that, by the time of her termination, she had accumulated a backlog of 400 unprocessed parcels. This latter action placed the Department in jeopardy of losing its federal funding and cost a significant investment of manpower and about $150,000 to fix. The record contains no indicia of pretext. Any remaining disputes regarding the reasons for Lewis's termination are, as the district court concluded, not material. Accordingly, the district court properly entered summary judgment in the Department's favor on Lewis's discrimination claim.

Second, the Department is also entitled to judgment as a matter of law on Lewis's claim of retaliation under the Rehabilitation Act. Lewis's retaliation claims, like her discrimination claims, fail under any standard. Director Geibel and Manager Foreman lacked retaliatory intent for the same reasons they lacked pretext in the discrimination context. The Department had legitimate, non-retaliatory reasons for terminating Lewis because of her repeated insubordinate behavior and her significant (and costly) backlog of unprocessed parcels. No evidence in the record suggests that a causal link exists between Lewis's decision to seek a remote-work accommodation or report disability discrimination and her termination.

Third, Lewis waived her Title VII claims. Rather than confront the reasons in the district court's order, Lewis briefly contests that her allegations under Title VII

should be presented to a jury without citation to any authority. The district court was correct to find her Title VII discrimination claim waived because she made a similar error below by failing to provide any evidence in support of her claim. Furthermore, Lewis's retaliation claim fails because no reasonable jury could infer that Director Geibel may have retaliated against Lewis for complaining about a pay raise he advocated for, especially by terminating her almost two years later. Accordingly, the judgment of the district court should be affirmed.

## ARGUMENT

### I.
### The Department is entitled to summary judgment regarding Lewis's Rehabilitation Act claims.

The Department did not discriminate or retaliate against Lewis under the Rehabilitation Act, *see* 29 U.S.C. § 794. The key question in any employment-discrimination case is whether, looking at the evidence as a whole, the facts "permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused" a "discharge or other adverse employment action." *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). On appeal, a district court's grant of summary judgment is reviewed de novo. *Brooks v. Avancez*, 39 F.4th 424, 433 (7th Cir. 2022) (citing *Gaddis v. DeMattei*, 30 F.4th 625, 630 (7th Cir. 2022)). Like the district court, this Court looks "at the facts in the light most favorable" to Lewis, who was the non-moving party, and determines whether she "is entitled to judgment as a matter of law." *Id.* (citing Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986)).

17

The material evidence in this case is undisputed: Lewis's insubordination and ineffectiveness were the reasons behind the adverse employment action the Department took against her. Lewis's disability did not factor into the Department's decision to terminate her employment. Nor did her decision to seek a work-from-home accommodation or her internal complaints where she alleged disability discrimination. These uncontested facts warrant summary judgment for two reasons. First, the record contains no evidence that the Department's legitimate, non-discriminatory justifications for Lewis's termination were pretextual, which means she cannot prevail on a claim of disability discrimination. And second, because there is no causal link between Lewis's work-from-home accommodation, her complaints of disability discrimination, and any adverse job action she suffered, she cannot prevail on her claim of retaliation, either.

## A. Lewis's Rehabilitation Act claim fails at summary judgment because she cannot meet her burden of showing that the Department's legitimate reasons for her termination were pretextual.

The Department is entitled to summary judgment on Lewis's disability-discrimination claim. The *McDonnell Douglas* burden-shifting framework provides a way for courts to consider whether an adverse employment action was caused by a prohibited consideration. *Ortiz*, 834 F.3d at 765 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). For Lewis to prove a claim of disability discrimination under § 504 of the Rehabilitation Act, she is required to carry the initial burden of making a prima facie showing that: (1) she is disabled; (2) she is otherwise qualified to perform the essential functions of her job with or without reasonable

18

accommodation; and (3) she suffered an adverse job action solely by reason of her disability. *Swain v. Wormuth*, 41 F.4th 892, 899 (7th Cir. 2022) (citing 29 U.S.C. § 764(a); *Felix v. Wis. Dep't of Transp.*, 828 F.3d 560, 568 (7th Cir. 2016)). Once she makes her prima facie case, the burden shifts to the Department to provide evidence of "legitimate, nondiscriminatory reasons" for the adverse action. *Brooks*, 39 F.4th at 434. Then, the burden shifts back to Lewis to demonstrate that those reasons are pretextual, or in other words, "an attempt to mask a discriminatory reason with a legitimate excuse." *Id.* (citing *Hooper v. Proctor Health Care Inc.*, 804 F.3d 846, 853 (7th Cir. 2015)).

Based on the undisputed facts of her case, Lewis cannot establish the requisite elements to make out a claim of § 504 discrimination. Lewis's disability was not a cause, let alone the sole cause, behind her firing. The Department had legitimate, non-discriminatory reasons for terminating Lewis—namely, her insubordination and her ineffective job performance—which had nothing to do with her medical condition (R.50-2 at 51, 56–57). Not even Lewis contends that her disability was the sole reason for her termination; she instead asks this Court to ignore the plain language of the Rehabilitation Act and import the Americans with Disabilities Act's "but-for" causation standard for her claim (Br. at 12–14). As discussed below, that is the wrong test for causation under both § 504(a)'s plain text and this Court's precedent, and the district court was right to reject it. Because the undisputed facts contain no evidence that these justifications were pretextual, the Department was entitled to judgment as a matter of law on Lewis's § 504 claim.

19

1. **"Solely by reason of" is the proper causation test for § 504 discrimination claims.**

The district court applied the proper causation standard when it granted the Department's motion for summary judgment. Despite Lewis's contentions otherwise, the language of § 504 and this Court's precedent both require disability-discrimination claims brought under the statute to be evaluated using a "solely by reason of" test for causation.

Starting with Rehabilitation Act's plain text, Section 504(a) unambiguously states that discrimination claims brought under the statute use the "solely by reason of" test for causation. *See United States v. Pace*, 48 F.4th 741, 753 (7th Cir. 2022) ("As with all issues of statutory interpretation, the appropriate place to begin our analysis is with the text itself, which is the most reliable indicator of congressional intent."). Although § 504(d) incorporates the "standards applied to" Title I of the ADA as the "standards used to determine" whether "this section has been violated in a complaint alleging employment discrimination," 29 U.S.C. § 794(d), Congress wrote a causation test specific to § 504(a) claims directly into that provision's text. The statute says, "No otherwise qualified individual with a disability in the United States … shall, *solely by reason of* her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a) (emphasis added).

Congress's decision to include "solely by reason of" in § 504(a) proves that it intended to use an elevated causation standard for Rehabilitation Act

20

discrimination claims, rather than incorporating the ADA's but-for causation standard. *Compare* 29 U.S.C. § 794(a) ("solely by reason of") *with* 42 U.S.C. § 12112 ("on the basis of"); *see also Monroe v. Indiana Dep't of Transp.*, 871 F.3d 495, 504 (7th Cir. 2017) (applying but-for causation after amendments to the language of the ADA's causation standard). Indeed, the text of § 504(a) links the "solely by reason of" standard to claims alleging "discrimination," 29 U.S.C. § 794(a), which means the sole-cause test applies equally to claims of discrimination arising from the employment context and non-employment-related cases. Since § 504 specifies that the disability must be the sole reason for discrimination, the statute allows a plaintiff to prevail on a claim of disability discrimination only if her disability is the *only* motivating factor for a prohibited act. *See United States v. Johnson*, 47 F.4th 535, 543 (7th Cir. 2022) ("To determine the plain meaning of a [term], courts frequently look to dictionary definitions"); *see also* "Solely," Merriam-Webster Online Dictionary, available at https://www.merriam-webster.com/dictionary/solely (last visited Nov. 14, 2025) (defining "solely" as "to the exclusion of all else" and "without another: singly").

This Court has already interpreted § 504 as applying a "stricter" standard "than the causation standard in Title I of the ADA" in several cases. *Swain*, 41 F.4th at 899. The first was *Conners v. Wilkie*, where this Court considered a failure-to-accommodate claim brought by a nurse at a Department of Veterans Affairs Hospital who had been terminated after the hospital declined to provide accommodations requested for her physical disability. 984 F.3d 1255, 1260 (7th Cir.

2021). While discussing the Rehabilitation Act's causation element, the Court noted that § 504 "expressly incorporates the liability standards of the Americans with Disabilities Act," aside from "one notable exception." *Id*. As this Court explained, the Rehabilitation Act requires that "the plaintiff's disability must the *sole* reason for the alleged discriminatory action." *Id*. (emphasis original). That proposition, it recognized, "contrasts with the ADA, which requires only that the plaintiff's disability be *a* reason for the challenged action." *Id*. (emphasis original) (citing *Brumfield v. City of Chicago*, 735 F.3d 619, 630 (7th Cir. 2013)).

Later in *Swain*, this Court reiterated that the Rehabilitation Act provides a more exacting causation test than the ADA when it decided an appeal involving a disabled civilian Army employee's claim that his employer discriminated against him by denying his request for overtime work. 41 F.4th 892 at 899. Setting out the statutory elements for the claim, the Court again explained that "a claim of disability discrimination under the Rehabilitation Act" requires proof that the plaintiff "suffered an adverse job action 'solely by reason of … his disability.'" *Id*. (citing 29 U.S.C. § 764(a); *Felix*, 828 F.3d at 568)). While observing that the statute incorporated the ADA's liability standards in other respects, it reaffirmed the general rule that "the Rehabilitation Act has a stricter causation requirement" because Titles I and II of the ADA do not "employ[ ] the phrase 'solely by reason of'" when setting out the causation standard for claims arising under them. *Id*. at 899 n.4.

22

Most recently, this Court rejected a plaintiff's request to read a "but-for" causation standard into § 504 in *Royan v. Chicago State University*, 145 F.4th 681, 693 (7th Cir. 2025). Relying on both *Swain* and *Conners*, the Court held, "Our precedent makes clear that the Rehabilitation Act's causation standard is more stringent than the ADA's 'but for' inquiry." *Id*. (citing *Swain*, 41 F.4th at 899; *Conners*, 984 F.3d at 1260).

*Conner, Swain,* and *Royan* adhere to the prevailing national view that, under § 504, a plaintiff can recover for discrimination only if a prohibited job action was motivated solely by her disability. *See Houston v. Texas Dep't of Agric.*, 17 F.4th 576, 586 (5th Cir. 2021) ("Under the Rehabilitation Act, an employer is liable only if the discrimination occurred 'solely by reason of her or his disability,' not when it is simply a 'motivating factor'"); *Wicomico Nursing Home v. Padilla*, 910 F.3d 739, 750 (4th Cir. 2018) ("To succeed on a claim under the Rehabilitation Act, the plaintiff must establish he was excluded 'solely by reason of' his disability; the ADA requires only that the disability was 'a motivating cause' of the exclusion"); *K.M. ex rel. Bright v. Tustin Unified Sch. Dist.*, 725 F.3d 1088, 1099 (9th Cir. 2013) (noting that § 504's "causal standard … is even stricter" than the ADA's because it requires the plaintiff "to show a denial of services 'solely by reason of' disability."); *G.C. v. Owensboro Pub. Sch.*, 711 F.3d 623, 635 (6th Cir. 2013) (holding § 504 requires proof that "plaintiff is being excluded from participation in, or being denied the benefits of, or being subjected to discrimination under the program solely by reason of his handicap.").

23

The *Conner* line of cases controls the causation standard for Rehabilitation Act discrimination claims and confirms, just as the district recognized in its opinion, that sole-cause is the proper basis for evaluating whether a plaintiff's disability caused employment discrimination. Lewis makes no mention of any of these cases. But even if she did, they are indistinguishable from her facts. Both *Conner* and *Swain* dealt with employment discrimination—one involving the termination of a worker who requested accommodations, *Conner*, 984 F.3d at 1260, and the other a denial of overtime for a disabled employee, *Swain*, 41 F.4th 892 at 899. And while *Royan* was not an employment case, it relied on *Conner* and *Swain* without qualification. 145 F.4th at 693. *Conner*, *Swain*, and *Royan* leave no room to suggest that § 504(a)'s sole-cause test applies any differently in cases, like Lewis's, where a plaintiff alleges employment discrimination after receiving an accommodation because of a disability. *Cf. Bostock v. Clayton Cnty., Ga.*, 590 U.S. 644, 656 (2020) (noting that multiple but-for causes may exist for a given employment action). The district court rightly chose to apply the "solely by reason of" standard below, and this Court should do the same here.

**2. Lewis cannot show that her disability caused her termination because there is no evidence to support an inference that the legitimate, non-discriminatory reasons provided for her firing were pretextual.**

Lewis cannot prove that her disability caused an adverse employment action under any standard of causation. The undisputed evidence establishes that Lewis was terminated not because of her disability, but because she had accumulated a backlog of unprocessed parcels that equated to two years of incomplete work and

24

was repeatedly insubordinate to her managers (R.50-1 at 83, 93–94 100; R.50-2 at 26, 56–58; R.50-6; R.50-7 at 3; R.50-8; R.50-9). Ultimately though, as the district court ruled, there is one dispositive issue: the undisputed material facts most favorable to Lewis do not add up to pretext (R.72 at 35, 40–41).

"In determining whether an employer's stated reason for discharge is pretextual, the question is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reason it has offered to explain the discharge." *Monroe*, 871 F.3d at 505 (citing *Harper v. C.R. England, Inc.*, 687 F.3d 297, 311 (7th Cir. 2012)) (cleaned up). "Pretext involves more than just faulty reasoning or mistaken judgment on the part of the employer." *Argyropoulos v. City of Alton*, 539 F.3d 724, 736 (7th Cir. 2008). It is a "lie, specifically a phony reason for some action." *Id.* To determine whether an employer's justification is pretextual, courts "do not sit as a super personnel review board that second-guesses an employer's facially legitimate business decisions." *Id.* (citing *Culver v. Gorman & Co.*, 416 F.3d 540, 547 (7th Cir. 2005)). "If a reasonable fact finder would be compelled to believe" an employer's explanation, then the employer "is entitled to summary judgment." *Id.*

The Department had legitimate reasons for terminating Lewis. The record contains a long list of insubordinate conduct on Lewis's part occurring up through the time of her termination, including episodes where:

- Lewis contested her duty to prepare and mail checks, despite the Department's accommodations, despite acknowledging that it was one of her responsibilities (R.50-1 at 83, 100; R.50-6; R.50-7 at 3);

25

- Lewis unilaterally told the finance department that she would not enter financial coding on the relocation vouchers, even though it was expected of her to ensure that the finance department could process checks (R.50-8; R.50-9; R.50-1 at 93–94);

- Lewis had poor attendance at meetings, remotely or in office, after receiving her work-from-home accommodation (R.50-1 at 103-04, 111; R.50-3 at 135);

- In meetings with consultants and managers, Lewis made negative comments about Director Geibel's ability to run his department, including one meeting shortly after Director Geibel started his position, where Lewis said that he was "unable to run this department because [he] did not have [his] real estate license" (R.50-2 at 31);

- Lewis spoke over Director Geibel during meetings (R.50-14 at 1); and

- After Director Geibel instructed Lewis to generate a report of the outstanding parcels assigned to her, she told him to "go find and run a report and create it" himself (R.50-2 at 26).[4]

Lewis also performed ineffectively on basic job functions. As a program director in the Department's Division of Real Estate, Lewis was responsible for "administer[ing] state and federal relocation programs statewide for the Indiana Department of Transportation and local governments" (R.50-18 at 1), which included reviewing, approving, and processing all relocation claim vouchers for assistance payments (R.50-18 at 1). Lewis acknowledged that she was required, as part of these duties, to assist mailing checks to claimants (R.50-1 at 91). However, after she received her work-from-home accommodation due to her kidney disease, Lewis, acting without approval from her supervisors, informed employees from the

---

[4] Director Geibel also testified, "when I asked directly to have a list of all things that were open, outstanding, past due," Lewis told him, "[N]o, go pull the report yourself" (R.50-2 at 51).

finance department that she would no longer be working in the office to mail out checks (R.50-1 at 83, 100).

Even worse, Lewis fell significantly behind on her work. In an October 2022 email, she admitted that she was "2 years behind closing out parcels" (R.60-9 at 1). Later, a report generated by the Department's data integrity specialist revealed that Lewis had over 400 outstanding parcels in need of processing, a backlog that placed the Department's federal funding in jeopardy and that cost over $150,000 to rectify (R.50-2 at 56–57).

Employee insubordination and a failure to meet legitimate expectations have long been regarded as valid justifications for adverse employment action. After all, an employer should reasonably expect that workers will follow orders, perform their job duties competently, and, at a minimum, refrain from disparaging others while doing so. *See Bruno v. Wells-Armstrong*, 93 F.4th 1049, 1055 (7th Cir. 2024) (finding no dispute as to pretext where "defendants' stated reason for not raising Bruno's salary is, in effect, that Bruno had been insubordinate") (cleaned up); *Monroe*, 871 F.3d at 506–07 (finding no evidence of pretext where employee was terminated, in part, because post-traumatic stress disorder "caused him … to be volatile toward his subordinates"); *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 863 (7th Cir. 2005) (holding that ADA did not provide protections for employee who could not "keep up with the production pace and abide by the quality control standards."). The Rehabilitation Act does not preclude an employer from discharging an individual who fails to meet these expectations, even if the misconduct is the consequence of a

27

disability. *Felix*, 828 F.3d at 574 (citing *Palmer v. Circuit Ct. of Cook Cnty.*, 117 F.3d 351, 352 (7th Cir. 1997); *Brumfield v. City of Chicago*, 735 F.3d 619, 630–31 (7th Cir. 2013)).

Despite Lewis's efforts to establish a triable factual dispute on the issue of pretext, she points to no "implausibilities, inconsistencies[,] or contradictions" that would support an inference that the Department terminated her for an unlawful reason. *Parker v. Brooks Life Sci, Inc.*, 39 F.4th 931, 938 (7th Cir. 2022). Where, as here, "a defendant has proffered more than one reason for the challenged action, a plaintiff must address all" of the employer's explanations. *Hudson v. Chicago Transit Auth.*, 375 F.3d 552, 561 (7th Cir. 2004). The district court noted below that Lewis failed to contest key allegations against regarding her refusal to do more work, her tendency to speak over Director Geibel at meetings, her negative comments about Director Geibel's ability to manage the division, and the fact that the Department incurred significant cost to clear the 400-parcel backlog that existed at the time of her termination (R.72 at 39–40). Her attempts to controvert the facts now on appeal come too little, too late.

First, Lewis waived any attempt to contest the validity of the facts related to her backlog of unprocessed parcels because she waited to raise these issues until her appeal. A party cannot raise an argument for the first time on appeal, *Sansone v. Brennan*, 917 F.3d 975, 983 (7th Cir. 2019), unless she can show that the issue constituted "plain error." *See Willis v. Lepine*, 687 F.3d 826, 839 (7th Cir. 2012) (holding that plain error review is "rarely applied in civil cases" and requires the

28

appellant to show a "miscarriage of justice will occur" because of exceptional circumstances affecting her substantial rights). The district court recognized that Lewis never contested the facts related to her backlog below (R.72 at 40), and the only reason she provides for why this Court should consider her arguments now is that the district court relied on uncited testimony from Director Geibel's deposition to decide summary judgment (Br. 24–25). That, however, is not error, plain or otherwise. Federal Rule 56(c) "*permits* the court to consider uncited material in the record when ruling" on a motion for summary judgment. *Flynn v. FCA US LLC*, 39 F.4th 946, 953 (7th Cir. 2022) (emphasis original).

In any event, Lewis misapprehends the pretext issue by focusing on whether Director Geibel's testimony about her backlog was "true" (Br. 23). Lewis's subpar work performance provided good reason for her employer to take action against her, but whether the Department's reasons for terminating Lewis are "inaccurate or unfair" is beside the point when it comes to pretext. *Monroe*, 871 F.3d at 505. The analysis focuses on whether Lewis's employer "honestly believed" the reasons offered to explain the discharge. *Id.* The evidence contains no need to believe the sincerity of Director Geibel's beliefs about Lewis's backlog. Lewis herself openly admitted that she was two-years behind schedule on processing outstanding parcels (R. 60-9 at 1). When Director Geibel eventually learned that this totaled to a backlog of 400 unprocessed parcels, which Lewis does not refute, he believed the situation was dire enough that the Department risked losing federal funding (R.50-2 at 58). As a result of Lewis's failures, Director Geibel was forced to move "very,

very fast," to reassign "a lot of internal folks" and hire "additional consultants … to take over and fix the risk," an endeavor that cost around $150,000 (R.50-2 at 57).[5] As the district court reasoned, this combination of facts undermines any contention that a reasonable factfinder could infer that Director Geibel lied when he testified that Lewis's failure to meet expectations was "the eye-opening component" that led him to recommend termination (R.72 at 40) (citing R. 50-2 at 57).

Second, the record does not reflect a genuine dispute about the reason that Director Geibel referred Lewis for termination. Context makes clear that Director Geibel did not provide conflicting or inconsistent answers on the subject. When asked whether there was a "straw that broke the camel's back" that caused him to stop giving Lewis "the benefit of the doubt," Director Geibel testified, "That point was when I asked directly to have a list of all things that were open … and I was told, no, go pull the report yourself" (R.50-2 at 51). Later, he described the discovery that Lewis had more than 400 open parcels as "the eye-opening component" that informed his decision to recommend Lewis for termination (R.50-2 at 57). In short, one response pertained to the event that caused Director Geibel to no longer give Lewis the benefit of the doubt while the other reflected the actual reason he decided to end her employment.

Third, Lewis's history of positive performance evaluations fails to establish pretext. As this Court has explained, the most important measure of an employee's

---

[5] Lewis's job description stated explicitly that "[f]ailure to meet deadlines and properly oversee compliance of state and federal laws could result in delays in construction and loss of project funding" (R.50-18 at 2).

performance is her work "*at the time* of the employment action." *Moser v. Indiana Dep't of Corr.*, 406 F.3d 895, 901 (7th Cir. 2005) (emphasis original). Prior work evaluations have "limited utility," and "cannot, by themselves, demonstrate the adequacy of performance at the crucial time when the employment action is taken." *Id*. Even though Lewis received positive feedback for her job performance in past reviews, this evidence is insufficient to contradict the fact that Director Geibel sincerely believed that 400-case backlog was professionally unacceptable when he discovered it after she began working remotely (R. 50-2 at 56–58)

Fourth, the fact that Lewis received new work assignments after becoming a full-time remote employee also does not support an inference of pretext. Although Lewis argues that Director Geibel and Manager Foreman assigned her more work as part of a "pattern of antagonism" (Br. 17), she complains of just two additions to her workload: the requirement that she complete a weekly outstanding-parcels report and the requirement that she attend daily calls with her supervisor (Br. 17–18). Aside from a cursory mention of the fact that Director Geibel cited her refusal to perform these new duties as a reason for her termination, Lewis provides no evidence of a pattern of antagonistic behavior from her supervisors. *See Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003) ("Summary judgment is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events."). What the undisputed evidence actually shows is that the meetings and report were added as part of an ongoing effort to improve communication and transparency with Lewis

31

while she worked from home and that Lewis opposed those attempts at every opportunity (R.50-2 at 46; R.50-3 at 68–69, 101). At base, Lewis's contentions are little more than an attempt to cast her insubordinate and ineffective conduct in a different light. Regardless of how she glosses the facts, though, insubordination and ineffective performance are still valid grounds for terminating an employee under the case law. *See Bruno*, 93 F.4th at 1055; *Hammel*, 407 F.3d at 863.

Fifth, the facts also do not support Lewis's contention that Director Geibel and Manager Foreman set her up to fail by ordering her to complete the weekly "active parcel/relo[cation] report" without assistance from the Department's data integrity specialist (R.60-8 at 4). Lewis likens the report to a "test that is intentionally made impossible to pass," but she has no evidentiary support for that inferential leap (Br. 22). *See Thomas v. Christ Hosp. & Med. Ctr.*, 328 F.3d 890, 894 (7th Cir. 2003) ("[C]onclusory assertions … are not sufficient to defeat a motion for summary judgment."). Just the opposite, the evidence refutes her bald assertions. Director Geibel and Manager Foreman waved Lewis away from the data specialist not to thwart her but because they did not believe he could generate the data they needed. Repeatedly throughout their exchanges about the report, Geibel and Foreman explained what data they needed from Lewis, how she could compile the data, and how her report would differ from the reports the data integrity specialist could generate (R. 60-8 at 1–4; R. 60-9 at 1–5). Geibel and Foreman sought "a snapshot of what was on [Lewis's] desktop" (R. 50-3 at 68–69), which was something Lewis alone could provide (R. 50-3 at 68–69; R. 60-8 at 1–4). Only Lewis appears to

32

have believed that the data specialist's involvement was necessary. Whether her beliefs reflect a misunderstanding about the assignment or a deliberate misrepresentation, they do not suggest that Director Geibel and Manager Foreman had ulterior motives in assigning the work to her.[6]

Section 504 "provides no protection for a disabled worker who," like Lewis, "for reasons unrelated to [her] disability performs in such an unsatisfactory manner … that [she] fails to keep up with" the demands of her job. *Hammel*, 407 F.3d at 863 (parenthetical original). Considering the "abundant evidence of" her "substandard performance," Lewis has not done enough to establish a genuine dispute of material fact regarding the cause of her termination. *Crain v. McDonough*, 63 F.4th 585, 595 (7th Cir. 2023). The Department was therefore entitled to judgment as a matter of law on Lewis's Rehabilitation Act discrimination claim.

## B. Lewis cannot prevail on her § 504 retaliation claim under any set of circumstances.

Summary judgment is also warranted on Lewis's claim that the Department retaliated against her because of her request for a work-from-home accommodation and her decision to report disability discrimination to the State Personnel

---

[6] Although Director Geibel eventually went to Data Specialist Hutcheson for assistance generating a report (R. 50-2 at 26–27), it appears that this differed from the report that Geibel and Manager Foreman intended for Lewis to create. Geibel and Foreman originally wanted Lewis to provide a weekly "snapshot" of the parcels on which she was actively working (R. 50-3 at 68–69). However, the report generated by Data Specialist Hutcheson appears to have captured only the "volume" of Lewis's outstanding parcels and the number of "closed" cases she had (R. 50-2 at 26–27). It was this report that revealed Lewis had a 400-parcel backlog in her assigned cases (R. 50-2 at 56–57).

Department. To establish a claim of retaliation under the Rehabilitation Act, Lewis must show that: "(1) she engaged in statutorily protected expression; (2) she suffered an adverse action by her employer; and (3) there is a causal link between her protected expression and the adverse action." *Fuller v. McDonough*, 84 F.4th 686, 690 (7th Cir. 2023); *Scaife v. United States Dep't of Veterans Affairs*, 49 F.4th 1109, 1118 (7th Cir. 2022).

Case law is inconsistent about the correct causation standard for retaliation claims. In *Brooks* and other cases, this Court has said that "a plaintiff must prove, by a preponderance of the evidence, that the protected category or action was the 'but-for' cause of the challenged adverse employment action" to prove unlawful retaliation. 39 F.4th 424, 440 (7th Cir. 2022) (citing *Rowlands v. United Parcel Serv.*, 901 F.3d 792, 801 (7th Cir. 2018)). But in *Fuller*, the Court held that a plaintiff "does not need to show but-for causation, just that retaliatory intent played a part in [the] termination." 84 F.4th at 691 (citing *Huff v. Buttigieg*, 42 F.4th 638, 645 (7th Cir. 2022)).

It is unnecessary for this Court to resolve the question regarding the proper causation test here, however, because Lewis's retaliation claims, like her discrimination claims, fail under any standard. Director Geibel and Manager Foreman lacked retaliatory intent for the same reasons they lacked pretext in the discrimination context. The Department had "legitimate, non-retaliatory reasons" for terminating Lewis because of her repeated insubordinate behavior and her significant (and costly) backlog of unprocessed parcels (*See generally* R. 50-1; R. 50-

2; R. 50-3; R. 50-8; R. 50-9). *See Fuller*, 84 F.4th at 691 (reasoning that plaintiff failed to prove causation because an employer "terminated Fuller for legitimate, non-retaliatory reasons: her violation of the scope protocol, her failure to carry out assigned work and the resulting delay in patient care, and conduct unbecoming of a federal employee"). The revelation that Lewis had 400 open parcels that exposed the Department to the risk of losing its federal funding was "eye-opening" to Director Geibel and ultimately prompted him to seek termination (R.50-2 at 56–57). He testified that this "kind of risk on the books as a division or an agency is … 100 percent not acceptable" (R.50-2 at 58). So even under a but-for causation standard, Lewis would have been fired once the scope of her job-performance problems came to light, irrespective of whether she sought an accommodation or complained of disability discrimination. *See Brooks*, 39 F.4th at 440 ("[W]hatever else was happening in the workplace, the plaintiff would have been terminated because Avancez had the honestly held belief that Brooks made threats of violence to other employees.").

Lewis's attempts to identify a genuine dispute related to these facts are unconvincing. She first argues that the close timing between her accommodation request and her firing show a causal link. But "any inference of causation supported by temporal proximity may be negated by circumstances providing an alternative explanation for the challenged action." *Adebiyi v. S. Suburban Coll.*, 98 F.4th 886, 892 (7th Cir. 2024). While it is true that Lewis received mostly positive evaluations prior to beginning her work-from-home accommodation, the change in attitudes

35

about her work performance were caused by her worsening communication with her supervisors, the lack of transparency about her work, and the revelation that she had a backlog of 400 unprocessed parcels (R.50-2 at 56–57; R.50-3 at 59).

Next, Lewis contends that Manager Foreman's skepticism over her need for a continued remote-work accommodation is evidence of causation because Manager Foreman, after learning through social media that Lewis attended a high school football game, sought to require Lewis to provide additional medical documentation for her accommodation and to travel to the office to stuff envelopes (Br. 32; *see* R. 50-3 at 53–54). Yet she neglects to account for the fact that Manager Foreman's frustrations resulted from Lewis's own lack of communication and transparency about her work—concerns that were vindicated after Director Geibel discovered Lewis's extensive backlog (R.50-2 at 56–57).

Lewis was fired because she was repeatedly insubordinate toward Director Geibel and Manager Foreman and because her ineffective job performance caused her to accumulate an egregious backlog of unprocessed parcels. The material facts most favorable to Lewis do not establish any meaningful dispute about the reasons behind her termination, nor do they allow for a reasonable factfinder to infer that the Department retaliated against her for receiving her accommodation or for complaining about disability discrimination. The district court's order granting summary judgment in favor of the Department should therefore be affirmed.

## II.
## The Department is entitled to summary judgment on
## Lewis's Title VII claims

The district court also corrected entered summary judgment on Lewis's Title VII claims. This Court should affirm because Lewis waived those claims by failing to make a developed argument on appeal, and even if she had not, the district court correctly found that the Department is entitled to summary judgment for those claims based on the record. To present a claim under Title VII, Lewis was required to present "evidence that similarly situated non-African-American employees were treated more favorably." *Johnson v. Advoc. Health and Hosps. Corp.*, 892 F.3d 887, 896 (7th Cir. 2018). This Court should affirm the district court's order because Lewis failed to do so.

### A.  Lewis waived her Title VII claims.

Lewis has waived any claim of error in the district court's ruling on her Title VII claims because she failed to present a developed argument regarding those claims. Lewis's brief does not engage the district court's reasoning as required under Rule 28(a)(8)(A) of the Federal Rules of Appellate Procedure. That Rule mandates that the appellant's brief contain her "contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies." *See Greenbank v. Great Am. Assurance Co.*, 47 F.4th 618, 629 (7th Cir. 2022) ("We have made clear that perfunctory and underdeveloped arguments, and arguments that are unsupported by pertinent authority are waived."). When a party fails to present a developed argument that the district court has erred, this

37

Court will dismiss the appeal. *Anderson v. Hardman*, 241 F.3d 544, 545 (7th Cir. 2001).

Lewis fails to confront the basis for the district court's judgment on her Title VII claims. The district court found that Lewis had waived her claim of racial discrimination under Title VII because she did not provide any "meaningful analysis regarding discrimination on the basis of her race itself" (R.72 at 45). Lewis does not challenge this conclusion (Br. at 33). The court further found that, in addition to waiving the claim, Lewis's racial discrimination claim would fail because she "provide[d] no supporting details as to whether [a White employee of the Department] was a comparator in job title, job duties, or other contributing factors to the disparity" (R.72 at 45 n.5). In addition to ignoring her waiver of the claim below, Lewis fails to assert that any evidence in the record shows she was treated disparately compared to a similar employee of another race (Br. at 33).

Next, the district court granted summary judgment for the Department on Lewis's Title VII retaliation claim because she failed to raise a material dispute about Director Geibel's sincere beliefs about her insubordination, noting that Director Geibel himself worked to help her get promoted (R.74 at 46–47). Citing only two pages of Director Geibel's deposition, Lewis contends that she offered evidence that he "harbored animosity toward her because of her race" and considered her complaint regarding her pay to be an act of insubordination (Br. at 33, citing R.50-3 at 34–35). But these claims are unsupported by Director Geibel's testimony or any other evidence in the record.

38

Director Geibel testified that he was aware that Lewis submitted a complaint that he "only gave [her] a 9 percent increase because she was black versus somebody getting a 12 percent increase who also was promoted right around the same time period" (R.50-2 at 35). However, Director Geibel did not state anything suggesting a connection between Lewis's complaint and any adverse action against her; nor did he say anything suggesting animosity towards her because of her race (R.50-2 at 34–35). By failing to point to any evidence in support of her claim, Lewis has again failed to raise a material dispute about Director Geibel's sincere belief that she was insubordinate for failing to listen to instructions or complete her job duties (R.50-2 at 51, 56–57).

Lewis does not cite any legal authority in support of her argument that her Title VII claims should be presented to a jury (Br. at 33). Because she has failed to develop an argument regarding these claims, they are waived. *United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991).

**B. Lewis has not shown racial discrimination.**

Waiver aside, Lewis failed to show racial discrimination because the record shows she failed to perform to her employer's expectations and she did not present any evidence that a similarly situated employee of another race was treated more favorably. Under Title VII, it is "unlawful … for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. §

39

2000e–2(a)(1); *see Bostock*, 590 U.S. at 655. Again, the legal standard is "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's [race] caused the discharge or other adverse employment action." *Ortiz*, 834 F.3d at 765; *Reives v. Ill. St. Police*, 29 F.4th 887, 892 (7th Cir. 2022). A reviewing court considers whether the undisputed material facts show that "(1) [a plaintiff] is a member of a protected class, (2) she was meeting her employer's legitimate expectations, (3) she suffered an adverse employment action, and (4) similarly situated employees not in her protected class were treated more favorably." *Johnson*, 892 F.3d at 895 (citing *David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 225 (7th Cir. 2017)).

Based on the undisputed facts presented, no reasonable jury could conclude that Lewis suffered any adverse employment action due to her race. Importantly, Lewis has failed to show the second and fourth elements of a Title VII discrimination claim. First, Lewis failed to timely attend meetings required by her manager to keep track of her progress and fell egregiously behind in closing out completed parcels (R.50-1 at 103-04, 111; 50-3 at 135). She also failed to complete the work required of her position and created an extensive backlog of uncompleted work (R.50-2 at 56-59; R.50-3 at 143). Her performance fell far short of expectations, which included the "review, approval and processing of all relocation claim vouchers for relocation assistance payments" (R.50-18 at 1).

Second, Lewis failed to show any similarly situated non-African American employee was treated more favorably. The only evidence in the record Lewis

40

advances for this element of her Title VII discrimination claim involves another employee who received three percent more of a raise for a promotion around the time Lewis was promoted. But the undisputed facts demonstrate that employee was being paid well below Lewis's salary range "both before and after the promotion" (R.50-2 at 34–36). Any raise disparity that occurred here was legitimate because it corrected the other employee's preexisting pay imbalance. *See Singmuongthong v. Bowen*, 77 F.4th 503 (7th Cir. 2023) (holding that a raise disparity can be legitimate "[w]hen … the pay was low" such that "a more substantial raise might be provided"). Furthermore, Lewis has shown no connection between the decision about her raise and her termination nearly two years later. Accordingly, the district court's judgment on this claim should be affirmed.

## C. Lewis has not shown Title VII retaliation.

Lewis was terminated due to her deficient performance and insubordination, not because she took part in protected activity (R.50-23). "To succeed on a Title VII retaliation claim, a plaintiff must produce enough evidence for a reasonable jury to conclude that (1) she engaged in a statutorily protected activity; (2) the [employer] took a materially adverse action against her; and (3) there existed a but-for causal connection between the two." *Robertson v. Dep't of Health Servs.*, 949 F.3d 371, 378 (7th Cir. 2020) (citation omitted). Furthermore, much like for § 504, Lewis must show "by a preponderance of the evidence" that her poor performance and insubordination "were not [The Department's] true reasons but were a pretext for discrimination." *Id*.

41

Lewis's Title VII claim fails for many of the same reasons her § 504 retaliation claim fails as discussed above. Lewis contends that evidence in the record shows that Director Geibel considered her complaint regarding her raise to be an "insubordinate" act in support of her Title VII retaliation claim (R.62 at 31–32; Br. at 33). Director Geibel did mention Lewis's raise complaint during his deposition in response to being asked whether he remembered incidents of Lewis being "insubordinate, contentious, and/or disrespectful[,]" but as stated above, Director Geibel did not suggest a connection between Lewis's complaint and any adverse action against her (R.50-2 at 34-35). Indeed, Director Geibel stated that the State Personnel Department handled the complaint and that he did not inquire about taking any adverse action against her because of it (R.50-2 at 36).

Lewis was promoted in March 2021, thanks in part to Director Geibel advocating on her behalf for "months and months" to secure the promotion (R.50-1 at 32-33; R.50-2 at 34–36). Lewis was not terminated until December 2022, almost two years later, and after Director Geibel learned that Lewis was egregiously behind on her work to great detriment to the Department (R.50-2 at 56-59; R.50-1 at 176; R.50-23 at 1). Lewis has failed to raise an issue of material fact regarding her employer's sincere belief about her poor performance and insubordination. Furthermore, no reasonable jury could conclude that Lewis's complaint regarding her pay raise nearly two years before she was terminated was causally related to her termination. See *Lesiv v. Ill. C. R.R. Co.*, 39 F.4th 903, 920 (7th Cir. 2022) (observing that "one-and-a-half-year gap was 'well beyond the time that would allow

a reasonable jury to conclude that [her] termination was causally related to [the protected activity]'") (quoting *Lalvani v. Cook County*, 269 F.3d 785, 790 (7th Cir. 2001)). Accordingly, this Court should affirm the judgment of the district court in all respects.

## CONCLUSION

For the foregoing reasons, the State respectfully requests that this Court affirm the judgment of the trial court.

Respectfully submitted,

THEODORE E. ROKITA
Indiana Attorney General
Attorney No. 18857-49

By:    /s/ Evan Matthew Comer
Evan Matthew Comer
Supervising Deputy Attorney General
Attorney No. 34546-72

/s/ John R. Oosterhoff
John R. Oosterhoff
Deputy Attorney General
Attorney No. 37658-49

OFFICE OF INDIANA ATTORNEY
GENERAL TODD ROKITA
Indiana Government Center South
302 West Washington Street, Fifth Floor
Indianapolis, Indiana 46204-2770
317-233.2728 (telephone)
Evan.Comer@atg.in.gov
*John.Oosterhoff@atg.in.gov*

*Counsel for Appellee*

**FED. R. APP. P. 32(g) WORD COUNT CERTIFICATE**

1.      Pursuant to Fed. R. App. P. 32(g), the undersigned counsel for the appellees certifies that this brief complies with the type-volume limitations of Circuit Rule 32(c) because the brief contains 11,394 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.      This brief has been prepared in a proportionally spaced typeface using Microsoft Word in font size 12, Century Schoolbook typeface for the text and the footnotes. *See* Cir. R. 32(b).

/s/ Evan Matthew Comer
Evan Matthew Comer
Deputy Attorney General

**CERTIFICATE OF SERVICE**

I hereby certify that on November 19, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system to all parties.

/s/ Evan Matthew Comer
Evan Matthew Comer
Deputy Attorney General
